# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ALLIANCE OPHTHALMOLOGY, PLLC; DALLAS RETINA CENTER, PLLC; TEXAS EYE AND CATARACT, PLLC; AND HOFACRE OPTOMETRIC CORPORATION, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ECL GROUP, LLC; ECL HOLDINGS, LLC; EYE CARE LEADERS HOLDINGS, LLC; EYE CARE LEADERS PORTFOLIO HOLDINGS, LLC; INTEGRITY EMR, LLC; INTEGRITY EMR HOLDINGS, LLC; ALTA BILLING, LLC; AND ALTA BILLING HOLDINGS, LLC, <br><br> Defendants. | 1:22-CV-00296-LCB-JLW |
| KIMBERLY FARLEY, CHAD FORRESTER, AND KIMBERLY SANDVIG, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> EYE CARE LEADERS HOLDINGS, LLC, <br><br> Defendant. | 1:22-CV-00468-CCE-JLW |

**MEMORANDUM IN SUPPORT OF JOINT MOTION FOR APPROVAL OF
SETTLEMENT CLASS AND PRELIMINARY APPROVAL OF
<u>CLASS ACTION SETTLEMENT</u>**

## <u>INTRODUCTION</u>

This is a consolidated action by two proposed classes of plaintiffs against ECL Group, LLC and its affiliated companies (collectively "Defendants"), which provide a variety of Electronic Medical Record ("EMR") and billing services to ophthalmology practices across country. Plaintiffs assert claims against Defendants for failing to protect against and then concealing a series of ransomware from 2019 to 2021 that shut down Defendants' software platforms and potentially exposed patients' personal data. The proposed "Physician Settlement Class" includes all ophthalmology practices that licensed Defendants' EMR and billing software during the outages caused by the ransomware attacks. The proposed "Patient Settlement Class" includes all patients whose personal information was exposed during the data breaches that resulted from those attacks.[1]

Following extensive negotiations—including a Judicial Settlement Conference mediated by the Honorable Patrick L. Auld—the parties have reached a global settlement, that, if approved, would resolve all class members' claims against Defendants and provide for the distribution of the limited available funds to class members on a pro rata basis.

Accordingly, the parties seek (a) preliminary certification of a mandatory settlement class under Federal Rules of Civil Procedure 23(a) and 23(b)(1)(B); and (b) preliminary

---

[1] The Physician Settlement Class and the Patient Settlement Class are referred to collectively as the "settlement classes."

2

approval of the Class Action Settlement Agreement ("Settlement"), including directing of notice to the settlement classes. Plaintiffs believe that this proposal is in the best interest of all members of the settlement classes. As described below, Defendants are among companies that were allegedly funded using assets that belonged to several insurance companies once owned and operated by Greg E. Lindberg. Those insurance companies are now subject to rehabilitation proceedings in North Carolina State Court, and, as a result of orders issued in those proceedings, Defendants must use all available resources to repay the insurance companies approximately $1.275 billion. This effectively means that the only assets available to pay the settlement class's claims are the proceeds of several insurance policies purchased by Defendants, which are subject to wasting clauses and would likely be exhausted by continued litigation. Settling this matter now will thus maximize the remaining coverage available to pay the class members' claims.

As set forth in the Settlement attached as Exhibit 1, the proposed Settlement would require the use of all remaining coverage to establish separate settlement funds in the amount of (i) $1,460,449.50for the Physician Settlement Class and (ii) $2,616,783 for the Patient Settlement Class.[2] The full amount of these funds, less costs of administration and court-approved attorneys' fees, would then be distributed to members of the respective

---

[2] Defendants have also agreed to assign any rights they may have under two remaining insurance policies to the Physician Settlement Class. To date, coverage has been refused under these policies. Any proceeds that may be recovered from these policies (which have a combined limit of $9 million) will be added to the settlement fund for the Physician Settlement Class.

3

settlement classes, on an equal, pro rata basis. In addition to the settlement funds, Defendants have agreed to provide future credits with a potential value of $5.6 million to the Physician Settlement Class, which they may use to offset licensing fees for Defendants' products.

Plaintiffs and their counsel believe that this represents the best possible recovery for the settlement classes and will result in the fair and equitable resolution of the class members' claims. For these reasons, and others set forth below, the parties jointly request that this Court preliminarily certify the proposed settlement class pursuant to Rule 23(b)(1)(B), preliminarily approve the Settlement, and direct notice to the settlement classes.

<u>**FACTUAL BACKGROUND**</u>[3]

## I.  THE RANSOMWARE ATTACKS, OUTAGES, AND DATA BREACHES

Defendants provide a variety of EMR and billing services to ophthalmology practices. The ophthalmology practices, in turn, use the Defendants' software to help treat their patients and manage their practices. The Physician Settlement Class here is comprised of ophthalmology practices who used one of the following services from Defendants since 2019: iMedicWare, myCare Integrity, My Vision Express ("MVE"), and revenue cycle management services. (Exhibit 1, Settlement Agreement, § 2.37(b)-(e)). The first three are

---

[3] This section details the allegations of the Physician Settlement Class and Patient Settlement Class. Defendants do not concede liability or the validity of the allegations.

4

EMR software services, and the latter assists with billing services and practice management. All of the services are designed to assist the Physician Settlement Class with its treatment of patients and management of their practices. The Physician Settlement Class entered into contracts with ECL Group, LLC ("ECL") for the provision of these services. (Exhibit 2.A, iMedicWare and revenue cycle management exemplar contract; Exhibit 2.B, myCare Integrity and revenue cycle management exemplar contract). ECL then engaged the other defendants for the provision of the applicable services.

ECL charged the Physician Settlement Class license fees of $3,500 per month for iMedicWare, $700 per month for myCare Integrity, and at least $300 per month for MVE. For revenue cycle management services, ECL received approximately 6% of a practice's net collections. ECL agreed to "use commercially reasonable efforts to make the [EMR] Software available 99% of the time," as measured on a monthly basis. It also agreed to restore service within 72 hours of an issue. In addition, the iMedicWare and myCare Integrity contracts specified that ECL would reduce the license fee as follows if the software uptime fell below 95%:

| We'll reduce your next month's subscription fee by | If our SLA rate drops to |
|---|---|
| 10% | 85-94.9% |
| 20% | 75-84.9% |
| 30% | 70-74.9% |
| 50% | 50-69.9% |

From November 2019 through 2021, defendants experienced a series of ransomware attacks and data breaches, resulting in significant service outages and disruption to the Physician Settlement Class's practices as follows:

5

- MVE experienced at least 10 business days of outages in 2019 from November 28 to December 11, and at least five business days of outages in 2021, including May 21 and 24, and June 7, 8, and 9;

- iMedicWare experienced at least 15 business days of outages in 2021, including March 22, 23, 24, 25, 26, 29, April 8, 13, 16, 20, 26, 27, and June 7, 8, and 9;

- myCare Integrity software experienced at least 21 business days of outages from August 26 to September 23, 2021.

ECL did not reduce its license fees as required by its contracts, instead charging the entire monthly license fee for the following month. ECL therefore breached the underlying contracts by overcharging the Physician Settlement Class. Thus, a conservative calculation of the Physician Settlement Class damages yields aggregate overcharge damages of at least $5,319,835 broken down as follows:

- iMedicWare – 30% overcharge for April 2021, 30% overcharge for May 2021, and a 10% overcharge for July 2021. At a rate of $3,500 per month, this amounts to a $2,450 overcharge per full-time licensee. At a rate of $1,750 per month, this amounts to a $1,225 overcharge per part-time licensee. The Physician Settlement Class includes 1,373 full-time and 683 part-time licensees of iMedicWare. Multiplying the amount of the overcharge against the applicable amount of licenses, and then combining the amount of overcharge for full-time and part-time licensees of iMedicWare results in an overcharge of at least $4,200,525.

- myCare Integrity – 20% overcharge for September 2021, 50% overcharge for October 2021. At a rate of $700 per month, this amounts to a $490 overcharge per full-time licensee. At a rate of $350 per month, this amounts to a $245 overcharge per full-time licensee. The Physician Settlement Class includes 721 full-time and 276 part-time licensees of myCare Integrity. Multiplying the amount of the overcharge against the applicable amount of licenses, and then combining the amount of overcharge for full-time and part-time licensees of iMedicWare results in an overcharge of at least $420,910.

6

- MVE – 10% overcharge for December 2019, 50% overcharge for January 2020, 10% overcharge for June 2021, and a 10% overcharge for July 2021. At a rate of $300 per month, this amounts to a $240 overcharge per licensee. The Physician Settlement Class includes 2,910 licensees of MVE. Multiplying the amount of the overcharge against the applicable amount of licenses results in an overcharge of at least $698,400.

Even after the complete outages outlined above, the software still had limited functionality that impacted the Physician Settlement Class and is not what they licensed. As an example, the skeleton version of iMedicWare restored after the ransomware attack prevented licensees from updating patient files and medical records through the software, billing for services through the software, scheduling surgeries through the software, and communicating with patients through the software.

ECL also agreed in its contracts to "retain [patient] data on a secure server and to maintain data recovery and data backup facilities in accordance with accepted industry practices." Yet ECL failed to do so, resulting in the Physician Settlement Class having no or limited access to its patients' medical records during the outages at issue. This forced the Physician Settlement Classes to reschedule substantive visits that required access to their patients' medical records, such as surgeries. Instead, the Physician Settlement Class was limited to more routine visits during the outages. The outages also impacted the Physician Settlement Class's ability to provide continuity of care to their patients and harmed their relationship with their patients, which impacted the reputation of the Physician Settlement Class. The Physician Settlement Class also had to divert resources from treating patients and managing the practice to handwriting medical records and

7

manually uploading patient data. Put simply, on top of contractual overcharge damages, the Physician Settlement Class suffered damages from decreased revenue and increased expenses for each day of an outage.

In addition, despite ECL's contractual agreement to "maintain the security of [patient] data using industry-standard data security protocols, and other methods reasonably deemed to be adequate for secure business data," the ransomware attacks and data breaches resulted in a vulnerability that potentially exposed the data of patients of the Physician Settlement Class. This vulnerability included online payment portals for members of the Physician Settlement Class who had contracted for revenue cycle management services, who also experienced outages. Thus, the Patient Settlement Class includes all individuals in the United States whose personally identifiable information and protected health information ("Private Information") was impacted by the ransomware attacks and data breaches. (Exhibit 1, § 2.37(a)). The Patient Settlement Class is in the millions.[4] The Patient Settlement Class suffered damages including (i) lost or diminished value of Private Information; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; and (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the data breaches, including but not limited to lost time. Even if each member of the Patient Settlement Class experienced was awarded nominal

---

[4] Defendants are currently pulling data to confirm the number, but have previously estimated that there are at least three million members of the Patient Settlement Class.

damages of $1.00, the damages for the class would exceed $3,000,000.

ECL also mischaracterized the nature of the outages via mass emails to the Physician Settlement Class referring to mere "technical issues" or just "performance issues" when, in fact, it had experienced ransomware attacks compromising the security of data. ECL also stated that no data had been compromised, though it later informed the Physician Settlement Class about the vulnerability that had been created by the attacks. Alongside its efforts to downplay the nature of the outages, ECL repeatedly promised that full service would be restored in short order, despite knowing that it would take weeks if not months to restore service in some instances.

ECL did not provide notice of the ransomware attacks to members of the Patient Settlement Class; rather, ECL only notified its customers, the Physician Settlement Class.[5] Some of the Physician Settlement Class members notified their patients that their Private Information was compromised as a result of these attacks.

## II.     THE CLASS ACTIONS

On August 20, 2021, counsel for the Physician Settlement Class sent a demand letter to ECL on behalf of Alliance Ophthalmology, PLLC ("Alliance"). Shortly thereafter, Dallas Retina Center, PLLC ("DRC") engaged counsel for the Physician Settlement Class. Counsel for the Physician Settlement Class sent a demand letter to ECL on DRC's behalf

---

[5] ECL maintains that it was prohibited from providing direct notice of the ransomware attacks to patients pursuant to HIPAA regulations and their business relationships with the Physician Settlement Class.

9

on September 14, 2021. Texas Eye and Cataract, PLLC ("TEC") then engaged counsel for the Physician Settlement Class, who sent a demand to ECL on behalf of TEC on October 7, 2021. That fall and winter, counsel for the Physician Settlement Class learned of the impact of the data breaches and outages on many ophthalmology practices spread across the country.

After a series of pre-litigation communications with ECL's then-outside counsel, the Physician Settlement Class filed their Class Action Complaint on April 15, 2022, asserting claims against ECL for breach of contract, fraud, and unfair and deceptive trade practices. (Doc. 1). ECL moved to dismiss the extracontractual claims on June 8, 2022 (Doc. 11), and the Physician Settlement Class filed a First Amended Class Action Complaint on June 29, 2022. (Doc. 14). ECL again moved to dismiss the extracontractual claims on August 19, 2022 (Doc. 22). The Court denied that motion on March 6, 2023. (Doc. 30).

ECL's customers, members of the Physician Settlement Class, started notifying affected patients about ransomware attacks in June 2022, over a year after the attacks first occurred. Thereafter, a number of class action complaints on behalf of the Patient Settlement Class were filed:

- June 10, 2022 – *Sandvig v. Eye Care Leaders Holdings, LLC*, 5:22cv234;

- June 21, 2022 – *Farley v. Eye Care Leaders Holdings, LLC*, 1:22cv468;

- July 1, 2022 – *Forrester v. Eye Care Leaders Holdings, LLC*, 1:22cv503;

- July 8, 2022 – *Solomon v. ECL Group, LLC*, 1:22cv526; and,

10

- August 2, 2022 – *Byers v. ECL Group, LLC*, 1:22cv607.

The Court consolidated all of these actions into the *Farley* matter on October 3, 2022. (Doc. 23). That same day, the Court appointed Gary Klinger, Gary Mason, and Jean Martin as Interim Co-Lead Counsel. (Doc. 24.) The *Farley* plaintiffs also moved to consolidate *Solomon* and *Byers* into the *Farley* action on October 5, 2022. ECL opposed consolidation of *Solomon* on the basis that it had a pending motion to dismiss in that case.

On October 26, 2022, a Consolidated Class Action Complaint was filed in *Farley* against Eye Care Leaders Holdings, LLC, asserting claims for negligence, negligence *per se*, invasion of privacy, unjust enrichment, and breach of fiduciary duty. (Doc. 31). Eye Care Leaders Holdings, LLC moved to dismiss the *Farley* consolidated complaint on November 14, 2022 (Doc. 35). The motion was fully briefed and the Court denied the motion on January 31 and February 1, 2023. (Docs. 46, 47), and the motion to dismiss in *Solomon* was denied as well. A few days later, the Court referred the consolidated *Farley* action to the Magistrate Judge for an Initial Pretrial Conference Hearing in March, and ordered that discovery on class certification shall be served no later than March 1, 2023. (Doc. 48). The Initial Pretrial Conference Hearing was scheduled for March 22, 2023 (Doc. 49). Defendant filed its Answer to the Consolidated Class Action Complaint on February 14, 2023. (Doc. 50).

At this point, with its motions to dismiss denied and expensive discovery about to commence, counsel for Defendants informed counsel for the Physician Settlement Class and counsel for the Patient Settlement Class that Defendants had limited funds available to

11

pay any judgment and, to the extent they had any funds, the funds were insurance proceeds under "wasting" or "eroding" policies.

## III. THE DEFENDANTS' LIMITED FUNDS

Greg E. Lindberg is listed as the sole manager of ECL Group, LLC, ECL Holdings, LLC, Eye Care Leaders Holdings, LLC, Eye Care Leaders Portfolio Holdings, LLC, and Integrity EMR Holdings, LLC, and Alta Billing Holdings, LLC. He is also listed as a manager of Alta Billing, LLC.

In 2020, Lindberg was convicted of conspiracy to commit honest services wire fraud and bribery concerning programs receiving federal funds. He was sentenced to 87 months in prison. The Fourth Circuit Court of Appeals overturned his conviction last year. That case is still pending. *United States v. Lindberg*, 5:19cr22 (W.D.N.C.). On February 23, 2023, Lindberg was charged with one count of conspiracy to commit crimes in connection with insurance business, wire fraud, and investment adviser fraud; one count of wire fraud; four counts of false insurance business statements presented to regulators; six counts of false entries about the financial condition or solvency of an insurance business; and one count of money laundering conspiracy for masterminding and directing a massive scheme to deceive state insurance regulators and defraud thousands of policyholders and others in connection with insurance companies he controlled. *United States v. Lindberg*, 3:23cr48 (W.D.N.C.). That case is stayed until resolution of the original case.

On June 27, 2019, Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company, Southland National

Reinsurance Corporation (the "Insurance Companies")[6]—entered into a Memorandum of Understanding ("MOU") with Lindberg, individually and as attorney-in-fact for each Specified Affiliated Company, and the Specified Affiliated Companies ("SACs") as defined in the MOU, along with two other entities. (Exhibit 3). Defendants are SACs bound by the MOU. (*Id.*)

Historically, Lindberg either owned or had the ability to control the Insurance Companies. (Exhibit 4, Amended Judgment and Order, *Southland National Insurance Corporation v. Lindberg, et al.*, Wake County Superior Court Civil Action No. 19-CVS-013093). He directed that the liquid assets of the Insurance Companies, including policyholder premiums, be used to invest in his non-insurance company businesses, including the SACs like Defendants. (*Id.* ¶¶ 18, 20, 24). The Insurance Companies are owed $1.275 billion from the affiliated entities, like the SACs, due to the affiliated investments. (*Id.* ¶ 106). The purpose of the MOU was to transfer ownership and control of the SACs to require that they be operated in the best interests of the Insurance Companies' policyholders by repaying the $1.275 billion debt. (*Id.* ¶¶ 47, 85).

After a trial, Judge Graham Shirley of the North Carolina Superior Court ordered specific performance of the MOU. (*Id.* ¶ 213). Again, the MOU requires that the SACs, including Defendants, be "operate[d] in a manner intended to allow each to repay or

<hr>

[6] The Insurance Companies are now subject to rehabilitation due to an action brought by the North Carolina Commissioner of Insurance, and are therefore subject to government control. *See Causey v. Southland National Insurance Corporation, et al.*, Wake County Superior Court Civil Action No. 19-CV-8664.

13

refinance or support the repayment, redemption or refinancing of" the $1.275 billion debt by December 31, 2029. (Exhibit 3, at 6). The Amended Judgment and Order was affirmed by the North Carolina Court of Appeals last month with respect to enforcement of the MOU, and remanded for further proceedings on remedies available for fraud. *Southland Nat'l Ins. Corp. v. Lindberg*, No. COA22-1049, 2023 WL 4066402, at \*6 (N.C. Ct. App. June 20, 2023). On July 13, the Supreme Court of North Carolina granted a temporary stay of the execution and enforcement of the Amended Judgment and Order. *Southland Nat'l Ins. Corp. v. Lindberg*, No. 173P23-1, 2023 WL 4533316 (N.C. July 13, 2023).

Because the state court action is still pending, the Temporary Restraining Order ("TRO") entered at the outset of that case and extended for the duration of the action by consent of the parties remains in effect. (Exhibit 5). The TRO currently prohibits the defendants in that action, or any third-party acting in concert with them, from:

- "taking actions, or causing any affiliated company to take actions, that would hinder the ability of the [SACs] to repay, refinance, or redeem their debt and equity obligations by December 31, 2019";

- "further encumbering, or causing any affiliated company to encumber, the [SAC's] and their assets, or taking any action, or causing any affiliated company to take any action, which would impair Plaintiffs' priority or interest in the [SACs] and their assets, to the extent such serve as collateral for obligations held by Plaintiffs";

- "taking any action, or causing any affiliated company to take any action, that would violate the Order of Rehabilitation in *Causey v. Southland National Insurance Corporation, et al.*, Wake County Superior Court Civil Action No. 19-CV-8664, including specifically the prohibition against the dissipation, waste, or impairment of any of the Plaintiffs' assets, including their interest as creditors of the [SACs]."

14

(*Id.*)

Given Defendants' debt of $1.275 billion, which far exceeds Defendants' assets, and the above orders requiring repayment of same prior to any other judgment or claim, Plaintiffs would not be able to collect on any assets of Defendants in the event of a judgment and Defendants are prohibited from entering into a settlement agreement that would reduce their assets.

As a result, available insurance proceeds and credits are the only available funds available for a settlement or judgment. There are four insurance policies that potentially provide coverage:

- Hiscox, Inc. Policy # MPL2403031.20, with an aggregate limit of $5,000,000 (the "Hiscox Policy"). (Exhibit 6).

- Travelers Property Casualty Co. of America, Cyberfirst Liability Policy, Policy # ZPL-51M70985-20-I5, with an aggregate limit of $3,000,000 (the "Travelers Policy"). (Exhibit 7).

- Evanston Insurance Company Policy # MKLV7PEO001144, with a stated limit of $2,000,000 (the "Evanston Policy"). (Exhibit 8).

- Massachusetts Bay Insurance Company ("Massachusetts Bay") Policy # OD6-A892313-05, with a stated limit of $7,000,000 (the "CGL Policy"). (Exhibit 9).

Defendants submitted a claim under each policy. But as of May 2023, coverage had only been provided under the Hiscox Policy. And because the Hiscox Policy is a "wasting" or "eroding" policy, the value of which is reduced as counsel for Defendants incur fees, only $1,156,33.50 remains under that policy. (Exhibit 10, Declaration of Emmanuel Bernabe).

15

As for the CGL Policy, Massachusetts Bay filed a declaratory judgment action on October 7, 2022, seeking a declaration that it was not obligated to provide coverage due to exclusions under the policy. *Massachusetts Bay Insurance Company v. ECL Group, LLC*, 1:22cv853 (M.D.N.C.).

With Defendants' limited funds looming in the background, the parties proceeded to negotiations.

## IV.    THE JUDICIAL SETTLEMENT CONFERENCE

After a period of negotiations about a potential resolution, on March 16, 2023, the *Farley* plaintiffs and defendant moved for a joint extension of time to complete discovery and stay discovery deadlines, and requested a status conference. (Docs. 52, 53). After a status conference on March 22, the Court ordered that the Patient Settlement Class and Eye Care Leaders Holdings, LLC participate in a judicial settlement conference with the Honorable L. Patrick Auld, with the anticipation of including the Physician Settlement Class and ECL Group, LLC.

Prior to the Judicial Settlement Conference, the Patient Settlement Class served counsel for Defendants with informal discovery requests tailored towards both the merits of the case and class certification. Defendants also produced copies of all potentially applicable insurance agreements, and the parties submitted confidential settlement conference briefs in which they discussed both the strengths and weaknesses of their cases.

Judge Auld scheduled an in-person Judicial Settlement Conference including all parties for April 10, 2023. At the Judicial Settlement Conference, the Patient Settlement

16

Class was represented by Gary Klinger, Jean Martin, Gary Mason, and Lisa White; the Physician Settlement Class was represented by Russ Ferguson, Matthew Tilley, and Patrick Spaugh; and Defendants were represented by Matthew Leerberg and Kristen Broz. Emanuel Bernabe, Chief Legal Officer for Defendants, also attended the Judicial Settlement Conference. After a full-day Judicial Settlement Conference supervised by Judge Auld, the parties agreed to a framework for a potential global resolution.

Over the ensuing months, the parties continued hard-fought negotiations about a potential global resolution. To facilitate these negotiations, the Court entered Interim Case Management Deadlines establishing deadlines to amend complaints, move for consolidation, move for appointment of interim lead counsel, finalize any settlement agreement, and move for preliminary class certification and approval of any class certification. (Doc. 57).

On May 1, 2023, the Physician Settlement Class filed its Second Amended Complaint, which added (a) Hofacre Optometric Corporation ("Hofacre") and the MVE class as plaintiffs, (b) defendants ECL Holdings, LLC, Eye Care Leaders Holdings, LLC, Eye Care Leaders Portfolio Holdings, LLC, Integrity EMR, LLC, Integrity EMR Holdings, LLC, Alta Billing, LLC, and Alta Billing Holdings, LLC; and (c) claims for negligence and defamation.

Counsel for the Physician Settlement Class then sent demands to Defendants within the disclosed limits of the applicable insurance policies. (Exhibit 11). In response, Travelers agreed to provide full coverage under the Travelers Policy. After accounting for

17

legal expenses under the Travelers Policy, which is also a "wasting" or "eroding" policy, the available amount of coverage was $2,920,899. Coverage, however, was denied under the Evanston Policy. (Exhibit 10). And Massachusetts Bay simply ignored the demands.

In sum, the total amount of available insurance proceeds is $4,077,232.50.

Due to protracted settlement negotiations, the parties sought extensions of time to facilitate further negotiations. The Court also consolidated the Physician Class Action with the Patient Class Action for settlement purposes. (Doc. 61). Finally, in late July, the parties finalized the Settlement. (Exhibit 1).

## V.    SUMMARY OF PROPOSED SETTLEMENT

The proposed Settlement is predicated on certification of the Physician Settlement Class and Patient Settlement Class under Rule 23(b)(1)(B) as a limited fund, non-opt out settlement. The settlement classes are defined as:

- "Patient Settlement Class" means all individuals residing in the United States whose PII or PHI was compromised in the Data Breaches affecting one or more Defendants, including all persons who received notice about the Data Breaches.

- "Physician Settlement Class" includes:

    o "iMedicWare Class" means all persons and entities who contracted with one or more Defendants for EMR management services using the iMedicWare software, and who have suffered Outages for any period of time since January 1, 2019, due to ransomware attacks or any other reasons.

18

o "myCare Integrity Class" means all persons and entities who contracted with one or more Defendants—and received services from Integrity EMR, LLC and Integrity Holdings, LLC—for EMR management services using the myCare Integrity software, and who have suffered Outages for any period of time since January 1, 2019, due to ransomware attacks or any other reasons.

o "MVE Class" means all persons and entities who contracted with one or more Defendants for EMR management services using the MVE software, and who have suffered Outages for any period of time since January 1, 2019, due to ransomware attacks or any other reasons.

o "Revenue Cycle Management Class" means all persons and entities who contracted with one or more Defendants—and received services from Alta Billing, LLC and Alta Billing Holdings, LLC—for revenue cycle management services who have received delinquent revenue cycle services for any period of time since January 1, 2019 and/or whose transaction information was potentially compromised from ransomware attacks or any other reasons.

As explained above, given that Defendants' liabilities dwarf their assets, that their assets are locked up by state court orders, and insurance funds are dwindling, there are limited funds available to satisfy any judgment. Moreover, given the pendency of multiple competing class actions and possibility of future class actions—including by the Patient Settlement Class against the Physician Settlement Class—a non-opt out class is the only way to ensure complete resolution and a fair distribution of the available proceeds to the settlement classes.

The Settlement provides for the creation of a $2,616,783 settlement fund for the Patient Settlement Class, and a $1,460,449.50 settlement fund for the Physician Settlement Class. This comprises the entirety of the available insurance funds. Because the Patient Settlement Class has potential claims against the Physician Settlement Class, the Patient

19

Settlement Class agreed to release its claims against the Physician Settlement Class in exchange for the Physician Settlement Class accepting a smaller settlement fund.

Defendants also agreed to assign the CGL Policy and Evanston Policy to the Physician Settlement Class. If any insurance funds are obtained under these policies, 67% of the funds will be contributed to the Physician Settlement Fund to be distributed equally to valid claimants, with the remaining funds being paid to counsel for the Physician Settlement Class, subject to this Court's approval.

In addition, Defendants shall also provide account credits to members of the myCare Integrity Class, iMedicWare Class, and MVE Class who did not previously receive a credit of equal or greater value and who held a license with Defendants as of April or May 2023. These credits are $3,500 for full-time licensees and $1,750 for part-time licensees of myCare Integrity; $1,000 for full-time licensees and $500 for part-time licensees of iMedicWare; and $350 for full-time licensees and $175 for part-time licensees of MVE. These credits have a potential value of $5,739,500. Due to Defendants' solvency concerns and the restrictions of the state court orders, these credits will be provided within one year of the date on which the Settlement Administrator approves a claim.

Moreover, Defendants agreed to cease all collection efforts related to any unpaid invoice for a month in which there was an outage, and members of the Physician Settlement Class may terminate their contracts with Defendants without any penalty. Moreover, Defendants shall provide members of the Physician Settlement Class with their data in a useable format to enable members to transition to a new vendor.

20

A Settlement Administrator will administer the notice and claims process for both settlement classes.

The Physician Settlement Fund, after deducting for Administration Expenses, Class Service Awards, and Attorneys' Fees, shall be divided equally between all valid claimants of the Physician Settlement Class. Defendants have agreed not to oppose the following from the Physician Settlement Fund: (i) Class Service Awards of $40,000 each to Alliance, DRC, and TEC, $20,000 to Hofacre, and $10,000 each to Shulkin Eye Associates, Gorden Eye Associates PA, Regional Eye Associates, Inc, and SurgiCenter of Vineland Holdings, LLC; and (ii) a request for attorneys' fees of no more than 33% of the Physician Settlement Fund.

The Patient Settlement Fund, after deducting for Administration Expenses, Class Service Awards, and Attorneys' Fees, shall be distributed to Patient Settlement Class Members who submit a Valid Claim for out-of-pocket expenses up to $5,000 with the remainder divided equally between all valid claimants of the Patient Settlement Class. Defendants have agreed not to oppose the following from the Patient Settlement Fund: (i) Class Service Awards of $1,000 each to Kimberly Farley, Chad Forrester, Kimberly Sandvig, Detrina Solomon, and Jeanne Byers; and (ii) a request for attorneys' fees of no more than 33% of the Patient Settlement Fund.

The costs associated with providing notice to the Settlement Classes and costs associated with administering the Settlement, including the costs of the Settlement Administrator, will be paid out of the respective Settlement Funds. (Exhibit 1, § 3.13). The

21

joint administration of both settlements will prevent duplicative costs, while allowing the Settlement Administrator to apportion costs to each Settlement Fund appropriately. (Exhibit 12, Declaration of Jean Martin ¶ 25).

Finally, the Settlement includes a general release of claims against Defendants by the Physician Settlement Class and Patient Settlement Class.

<u>QUESTION PRESENTED</u>

Should the Court (a) preliminarily certify a mandatory settlement class under Federal Rules of Civil Procedure 23(a) and 23(b)(1)(B); and (b) preliminarily approve the Settlement and direct notice to the settlement classes?

<u>ARGUMENT</u>

## I. THE COURT SHOULD PRELIMINARILY CERTIFY THE PROPOSED SETTLEMENT CLASSES.

### A. Legal Standard

Prior to preliminarily approving a proposed settlement, the Court must first determine whether the proposed Settlement Classes are appropriate for certification. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Hall v. Higher One Machines, Inc.*, No. 5-15-CV-670-F, 2016 WL 5416582, at *2 (E.D.N.C. Sept. 26, 2016). To certify a class for settlement purposes, the Court must find that all requirements of Rule 23(a) and at least one of the provisions of Rule 23(b) are satisfied. *See Amchem*, 521 U.S. at 620. "The propriety of certifying plaintiff classes for the purposes of implementing settlements is well-recognized." *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 335, 338 (D.S.C. 1991). In

22

determining whether to certify a settlement class, any issue of whether the case, if tried, would present trial management problems is excluded, because the settlement precludes any trial. *Amchem*, 521 U.S. at 620.

Here, the Physician Settlement Class and Patient Settlement Class warrant certification under Rule 23(b)(1)(B), which provides for the certification of mandatory class when there is a "limited fund" and thus insufficient resources to satisfy the claims of all of the members of the proposed class. *See Herrera v. Charlotte Sch. of L., LLC,* 818 F. App'x 165, 172 (4th Cir. 2020); *see also* Fed. R. Civ. Proc. 23(b)(1)(B) (authorizing certification where "prosecuting separate actions by individual class members would create the risk of . . . [judgments] that, as a practical matter, would be dispositive of the interests of the other members" of the proposed class).

**B.    The Proposed Classes Meet The Requirements Of Rule 23(a)**

*1.    Numerosity*

To meet the numerosity requirement, there must be a large enough group of plaintiffs to make joinder of all class members impracticable. Ce*nt. Wesleyan Coll. v. W.R. Grace & Co*., 6 F.3d 177, 183 (4th Cir. 1993) (class of 480 members "would easily satisfy numerosity requirement"); *see also In re Outer Banks Power Outage Litig.*, 2018 WL 2050141, at *4 (E.D.N.C. 2018) (class consisting of between 1,775 and 2,800 properties and businesses satisfied numerosity requirement). The proposed classes easily meet this requirement. According to ECL's records there are approximately 6,133 practices in the

23

Physician Settlement Class.[7] (Exhibit 10). The Patient Settlement Class, who are comprised of these practices' patients, has been estimated to exceed 3.6 million. (Doc. 31 at 2, 4). Consequently, the parties' proposed Settlement Classes easily satisfy the numerosity requirement.

### 2. *Commonality and Typicality*

"[T]he requirements for typicality and commonality often merge." *In re Outer Banks*, 2018 WL 2050141, at *4 (citation omitted); *Rehberg v. Flowers Baking Co. of Jamestown*, LLC, 2015 WL 1346125, at *9 (W.D.N.C. 2015).

The question of "typicality" asks if, "'the claims of the representative parties [are] typical of the claims of the class.'" *In re Outer Banks*, 2018 WL 2050141, at * 4 (quoting *Haywood v. Barnes*, 109 F.R.D. 568, 577 (E.D.N.C. 1986); *see also Souter v. Equifax Info. Servs.*, LLC, 498 Fed. Appx. 260, 264–65 (4th Cir. 2012) (unpublished); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). A claim is typical if it "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554,561 (6th Cir. 2007). The typicality requirement is "captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class."

---

[7] The Physician Settlement Class consists of four subclasses, which correspond to each software product or service at issue. Based on ECL's records, the approximate number of practices in each subclass is as follows: (a) iMedicWare Class - 2,056 practices (1,373 full-time and 683 part-time); (b) myCare Integrity Class – 997 practices (721 full-time and 276 part-time); (c) MVE Class – 2,910 practices; and (d) Revenue Cycle Management Class – 170 practices (166 full-time and 4 part-time).

*Deiter*, 436 F.3d at 466 (quotation omitted); *see Souter*, 498 Fed.Appx. at 264–65; *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998).

The question of "commonality" asks whether the class members' claims "depend upon a common contention," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A common question is one "that can be resolved for each class member in a single hearing." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006). There must be "at least one common question of law or fact . . . among class members." *Speaks v. U.S. Tobacco Coop., Inc.*, 324 F.R.D. 112, 136 (E.D.N.C. 2018).

Similarly, typicality requires the claims of the class representatives to "arise[] from the same course of conduct that gives rise to the claims of the class members" and be "based on the same legal theories." *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 637 (D.S.C. 1992). The test of commonality is "not demanding." *James v. City of Dallas,* 254 F.3d 551, 570 (5th Cir. 2001). "The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993); *Speaks*, 324 F.R.D. at 136.

Here both the requirements of typicality and commonality are met. The named plaintiffs' claims are typical of those in the settlement classes, and all turn on the same core factual allegations.

25

Plaintiffs' claims all arise out of Defendants' alleged failure to secure against, mitigate, and provide timely notice of, the same data breaches. The Physician Settlement Class's breach of contract claims rest on provisions that were common to all of Defendants' licensing agreements. (Second Amended Complaint, at ¶¶ 25, 39). Among the named physician plaintiffs, there is also at least one practice that purchased each of Defendant's EMR and revenue-cycle management products at issue. Likewise, the Physician Settlement Class's claims for negligence, fraud, and unfair trade practices all turn on conduct that was common to the proposed class—*i.e.*, that Defendants failed to secure against the ransomware attacks and, once those attacks occurred, falsely represented to hat the outages were the result of mere technical issues, and failed to timely notify the practices that of the ransomware attacks. (*Id.* at ¶¶ 132, 137-147, 156-210).

The Patient Settlement Class's claims for negligence, invasion of privacy, and breach of fiduciary duty likewise seek to recover for damages resulting from the same alleged conduct. (Doc. 31 at ¶¶ 124, 126-189). There are myriad common questions of law and fact with regard to the Patient Settlement Class, such as whether ECL owed a duty to protect and secure the Private Information of the patients, whether ECL breached that duty, whether ECL maintained reasonable security procedures and practices appropriate to the nature of storing the Private Information of patients, and whether patients have actionable claims against ECL. These common questions of law and fact arise from the same data breaches.

26

### 3. *Adequacy*

Rule 23(a)(4) requires that class representatives are capable of fairly and adequately representing the interests of the class. This requires settling plaintiffs to show that: (1) class representatives have no actual or potential conflicts of interest with the putative class and "possess the same interest and suffer the same injury as the class members"; and (2) "plaintiffs' counsel [is] 'qualified, experienced and generally able to conduct the proposed litigation.'" *Rehberg*, 2015 WL 1346125, at *11 (citations omitted); *In re Outer Banks*, 2018 WL 2050141, at *4. Here, Plaintiffs satisfy both requirements.

*First*, there is no actual or potential conflict of interest between the named plaintiffs and putative class members. The named plaintiffs for both settlement classes are members of the class they seek to represent, possess the same interests as the class, and allege that they suffered the same injury as the class members as a result of the same alleged conduct. *Amchem*, 521 U.S. at 625-26.

*Second*, the requirement of adequacy is satisfied. Plaintiffs' counsel are experienced and generally able to conduct the proposed litigation. The Court has already appointed interim class counsel for the Patient Settlement Class in the consolidated *Farley* matter. (Doc. 24). Combined, Class Counsel have extensive experience in consumer protection and complex litigation, including substantial experience in class actions. (Exhibit 12, ¶¶ 2-7; Exhibit 13, Declaration of Matthew Tilley, ¶¶ 3-6). Class Counsel has zealously and ably represented the interest of the Plaintiffs and the individuals they wish to represent, and if this Settlement is approved, will zealously and ably represent the interests of the Settlement

27

Classes.

### C. The Proposed Settlement Classes Meet The Requirements Of Rule 23(b)(1)(B).

The Settlement is a Rule 23(b)(1)(B) limited fund settlement. Limited fund settlements permit certification of a mandatory class when "prosecuting separate actions by or against individual class members of the class would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1).

Courts have interpreted Rule 23(b)(1)(B) to authorize the certification of such a mandatory class when there is a "limited fund" available to satisfy all claims against a defendant and individual actions would deplete the fund and deprive class members of recovery they would otherwise achieve through settlement. *See Herrera*, 818 F. App'x at 172 (affirming limited fund settlement where remaining insurance policies, with the exception of $150,000, represented defendant's only appreciable asset); *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 326 (N.D. Tex. 2011) ("The basic concept of a 'limited fund' settlement is that there is a definite, limited amount of capital that is available to class members, and that such a fund is insufficient to cover all claims."). Accordingly, under Rule 23(b)(1)(B), the individual class members cannot opt out of the class because to do so would jeopardize the fair and equitable distribution of the limited fund.

28

The Supreme Court and this Circuit have identified three "presumptively necessary" characteristics to ensure that the mandatory Rule 23(b)(1)(B) settlement class device is limited to appropriate circumstances:

(1) "[T]he totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims."

(2) "[T]he whole of the inadequate fund [is] to be devoted to the overwhelming claims."

(3) "[T]he claimants identified by a common theory of recovery [are] treated equitably among themselves."

*Herrera*, 818 Fed. Appx. at 173 (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 838-39, 842 (1999)); *see also In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 16-17 (D.D.C. 2011) (certifying limited fund class), *as amended* (2011); *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, 2010 WL 11506713, at *25-26, 49 (N.D. Ala. 2010) (noting judge "properly certified" limited fund class).

When these characteristics are present, the Court is justified in certifying the class under Rule 23(b)(1)(B) and binding all class members. *Herrera*, 818 Fed. Appx. at 173. In the instant case, the submissions demonstrate that certification of the Settlement Class under Rule 23(b)(1)(B) is appropriate and necessary to protect the interest of all class members.

### 1. *There Are Inadequate Funds to Pay All Claims*

The first factor requires a determination of (i) the amount of damages in the case, and (ii) the upper limit of the fund in question, to enable the court to evaluate whether the

29

fund is inadequate to pay all the claims. *Herrera*, 818 Fed. Appx. at 174 (upholding certification of class claims against the Charlotte School of Law when, with the exception of $150,000, insurance policies represented only remaining funds to pay plaintiffs' claims). When it is possible to determine through evidence and judicial experience that the classes' claimed damages exceed the available funds for settlement, certification is appropriate. *Herrera,* 818 Fed. Appx. at 174.

Here, there two classes of Plaintiffs. The Physician Settlement Class seeks to recover, among other things, (i) contractual damages, in the form of refunded licensing fees for the periods when Defendants' software was unavailable due to outages caused by the ransomware attacks; and (ii) damages for lost revenue resulting from either the inability to see patients or lost billing information. The Patient Settlement Class seeks to recover damages related to the ransomware attacks, including lost value of their Private Information that was compromised, the present and future risk of identity theft and fraud, and lost time and out of pocket expenses dealing with the consequences of the ransomware attacks.

As set forth above, just the contractual portion of the Physician Settlement Class's damages alone is enough to well exceed the funds available for settlement. Defendants' licensing agreements required them to refund all or a portion of the applicable licensing fees in the event their software did not meet certain availability thresholds. Thus, it is possible to calculate the refunds owed the Physician Settlement Class based on the relevant contractual provisions and the number of days Defendants' experienced outages for each

30

of the products at issue, which are not in dispute. That math alone produces approximately $5.3 million in damages—a figure that in-and-of-itself exceeds the current funds available to pay claims. (*Id.*)

The Physician Settlement Class's claims, however, are not just limited to the contractual refunds owed under their licensing agreements; the Physician Settlement Class also seeks to recover lost revenue. Because the Physician Settlement Class had no access to their patients' medical records during the outages, they had to reschedule substantive visits that would require reference to their patients' medical records, such as surgeries and other procedures. Thus, the scope of visits was limited during the outages. There is also a one-week period for which data necessary to bill for patient visits was lost entirely. Any calculation of the lost revenue damages produces a figure that would exceed the remaining funds many times over.

Based on their own financial records, the named plaintiffs estimated that their average revenue per physician was approximately $9,000 per day. Even if one assumes that the practices were able to still see patients for some visits during outages, and thus were still able to generate 50% of their average daily revenue ($4,500 per full-time physician and $2,250 for each part-time physician), the losses total in the hundreds of millions. With 15 days of outages for iMedicWare, the damages would be $115,175,750.[8]

---

[8] 1,373 full-time physicians multiplied by $4,500 ($6,178,500), and 683 part-time physicians multiplied by $2,250 ($1,536,750) for a total of $7,715,250 per day, times 15 days, equals $115,728,750.

31

With 21 days of outages for myCare Integrity, the damages would be $81,175,500.[9] And with 15 days of outages for MVE, the damages would be $196,222.500.[10] Added together, this would produce $392,573,750 in losses, before even considering any additional, out-of-pocket expenses the practices incurred responding to the outages.

The claims of the Patient Class are also likely to far exceed remaining available funds. With potentially more than 3.6 million members in the Class, even nominal damages of $1.00 - $10.00 per class member would place the value of claims between $3.6 million - $36 million. While classwide data breach damage models remain largely untested, the typical measure of damages proffered has been a market value of PII based upon black market rates for the data points involved. *See*, e.g. *In re Brinker Data Incident Litig.*, No. 3:18-CV-686-TJC-MCR, 2021 WL 1405508, at *3 (M.D. Fla. Apr. 14, 2021) (denying *Daubert* challenge to expert using dark web average values as a methodology for calculating damages); *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 694 (N.D. Cal. 2019) (same); *cf. In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.,* 341 F.R.D. 128, 153 (D. Md. 2022) (denying class certification on plaintiffs' market theory approach but approving overpayment theory approach).

---

[9] 721 full-time physicians multiplied by $4,500 ($3,244,500), and 276 part-time physicians multiplied by $2,250 ($621,000), for a total of $3865500 per day, times 21 days, equals $81,175,500.
[10] 2,907 full-time physicians multiplied by $4,500 ($13,081,500), times 15 days, equals $196,222,500.

Under a market theory approach, members of the Patient Settlement Class may have been able to recover $2 - $25 per person for their Social Security numbers involved in the Data Security Incident. *See*, https://www.cnbc.com/2018/08/22/how-much-hackers-get-for-social-security-numbers-on-the-black-market.html (Social Security numbers selling from $2 - $25); *see also In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633, Motion for Class Certification, ECF No. 156, p. 20 (valuing Social Security numbers at $5). Under this damages model, the claims of the Patient Class would be $7.2 million - $90 million. Once it has determined the amount of potential damages, the Court must also determine whether the amount of funds available to satisfy the claims is inadequate. As detailed above, it is undisputed that the amount of Defendants' available funds is inadequate to satisfy the claims.

There is also no dispute that the remaining insurance coverage represents the only available source to pay the class members' claims. To justify a limited fund settlement, the Supreme Court requires that the Court confirm that the "limited fund" is "set definitively at [its] maximum[ ]." *Ortiz*, 527 U.S. at 838. To show this, "the settling parties must present not only their agreement, but evidence on which the district court may ascertain the limit . . . of the [available] fund[s]." *Id.* at 849.

Here, there is ample evidence as to the limited nature of the remaining funds and that they have been set at their maximum. As to the insurance proceeds that will go to fund the settlement, there is no dispute that the full extent of remaining and available coverage will be used to create the settlement funds.

33

There is also no dispute that the remaining coverage under Defendants' insurance policies comprises the only assets available to pay the class members' claims. As set forth above, the court orders and MOU with the government in the rehabilitation action require that Defendants, as "SACs," be operated for the benefit of repaying the $1.275 billion in debt necessary to refund the insurance companies under the rehabilitator's control. The orders also prohibit Defendants from otherwise transferring or encumbering assets that must be repaid under the MOU. Effectively, this means that the proceeds of Defendants' insurance policies represent the only available funds—and the maximum fund—that may be used to pay class members' claims.

"[T]he fact that [a settling company] will maintain limited assets to continue operations does not preclude the Court from approving this settlement. Indeed, courts have approved 'limited fund' settlements that do not encompass a company's entire net worth." *Stott*, 277 F.R.D. at 331; *see also Williams v. Nat. Sec. Ins. Co.*, 237 F.R.D. 685, 692 (M.D. Ala. 2006) (approving Rule 23(b)(1)(B) settlement where proposed settlement "reduces [defendant's] surplus [of funds] by approximately 35%"). This is especially true when— as here—the assets and continued operations of Defendants are required by court order.

In sum, the parties have demonstrated the existence of a limited fund insufficient to pay the class members' claims.

## 2. *Fund Wholly Devoted to Claims*

The second necessary component for a limited fund settlement requires that the settlement fund at issue be wholly "devoted to the overwhelming claims." *Ortiz*, 527 U.S.

34

at 839. Here, there is no dispute that the *entire* settlement fund, minus attorneys' fees, and costs, is to be used to compensate class members. (Exhibit 1, §§ 3.1, 3.5).

### 3. *Equitable Treatment*

The third and final necessary element of Rule 23(b)(1)(B) limited fund certification is that "the claimants identified by a common theory of recovery [are] treated equitably among themselves." *Ortiz*, 527 U.S. at 839. Primary equity considerations are the inclusiveness of the class and the fairness of distributions to those within it. *See id.* at 854.

Here, the classes are inclusive. The Physician Settlement Class contains all physician practices that licensed the EMR and revenue-cycle software products that suffered outages as a result of the ransomware attacks. Likewise, the Patient Settlement Class includes all patients whose data was effected by the outages or subject to potential disclosure. Accordingly, the Court can be assured that "all similar claims" will be brought before it, "either directly or through representation," in order to be resolved on an equitable, pro rata basis. *Ortiz*, 527 U.S. at 841.

Pursuant to the Settlement all funds will be distributed among the members of the Physician Settlement Class on an equal, *pro rata* basis. (Exhibit 1, § 3.5). The Patient Settlement Fund will be used to reimburse out of pocket expenses up to $5,000, with the remainder to be distributed on a pro rata basis to all Patient Class members who file a claim. (*Id.*)

35

The Supreme Court has recognized that the "simple equity" of such a pro rata distribution represents the fairest when circumstances dictate a limited fund settlement. *See Ortiz*, 527 U.S at 841 ("'If the fund is not sufficient to discharge all claims upon it in full . . . equity will incline to regard all demands to stand on an equal footing, and will decree a pro rata distribution or payment'" (quoting 1 J. Pomeroy, Equity Jurisprudence § 407, pp 764-65 (1918)). The Settlement treats all class members equitably relative to one another because all who have been damaged are eligible to receive reimbursement based on expenses incurred, not on any unequitable basis. (Exhibit 1, § 2). Because there is no disparate treatment amongst the members of the proposed settlement classes, the Settlement merits preliminary approval.

For the above reasons, preliminary certification of the Proposed Settlement Classes pursuant to Rule 23(b)(1)(B) is fair, reasonable, and appropriate, and the Settlement satisfies the requirements set forth in *Herrera* and *Ortiz.*

## II.    THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT.

### A. Legal Standard

The judicial policy in favor of settlement is particularly strong in class actions and other complex litigation. *See In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (noting the "strong judicial policy in favor of settlements, particularly in the class action context").

36

The "law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995); *see also* 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions §11.41, at 87-88 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy . . . By their very nature, because of the uncertainties of outcome, difficulties of proof, and length of litigation, class action suits lend themselves readily to compromise.").

Federal Rule of Civil Procedure 23(e) requires that any compromise of claims brought on a class basis be subject to judicial review and approval. Rule 23(e)(2) provides that a court may approve a proposed class settlement "on a finding that it is fair, reasonable, and adequate." The procedure for review of a proposed class action settlement is a well-established two-step process. For the first stage, a court preliminarily approves the settlement pending a fairness hearing, certifies the class for settlement purposes and authorizes notice to be given to the settlement class. *Manual for Complex Litig. (Fourth)* §21.632 at 320 (2004). Once the class has received notice and has an opportunity to object to or opt-out of the settlement, the court then holds a final settlement hearing. *Id.* §21.633 at 321-22.

The Fourth Circuit has bifurcated the preliminary approval analysis into "consideration of the fairness of settlement negotiations and the adequacy of the consideration to the class." *Gaston v. LexisNexis Risk Sols. Inc.*, No. 5:16-cv-00009, 2021 WL 244807, at *5 (W.D.N.C. Jan. 25, 2021) (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d

37

155, 158-59 (4th Cir. 1991). The 2018 amendments to Rule 23(e) also formalize a list of core considerations for settlement approval such as: (1) whether class representatives and class counsel have adequately represented the class, (2) whether the proposal was negotiated at arm's length, (3) whether the relief provided for the class is adequate, and (4) whether the proposal treats Settlement Class Members equitably relative to each other. Fed. R. Civ. P. 23(e)(2). The Fourth Circuit has held that the *Jiffy Lube* standards "almost completely overlap with the new Rule 23(e)(2) factors, rendering the analysis the same." *See Herrera v. Charlotte School of Law, LLC*, 818 F. App'x 165, 176 n.4 (4th Cir. 2020). At the preliminary approval stage, "the Court need only find that the settlement is within 'the range of possible approval.'" *Gaston*, 2021 WL 244807, at *5 (quoting *Scott v. Family Dollar Stores, Inc.*, No. 3:08- cv-00540, 2018 WL 1321048, at *3 (W.D.N.C. Mar. 14, 2018)). As discussed herein, the Settlement here, reached after substantial litigation by sophisticated counsel with the assistance of Judge Auld fits comfortably within the range of approval, particularly in light of the limited fund available.

### B. The Proposed Settlement is Fair

In analyzing whether a settlement is fair, the Fourth Circuit considers: (1) the posture of the case at the time of the settlement; (2) the extent of discovery that has been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel. *See In re Jiffy Lube*, 927 F.2d at 158-59; *McLaurin*, 2011 WL 13146422, at *3.

First, the events giving rise to this dispute date back to November 2019. As shown above, factual investigation into potential claims began in the summer of 2021. This led to

38

pre-litigation negotiations, which were unsuccessful. As a result, Plaintiffs filed class action complaints in 2022 and then engaged in rigorous motions practice to avoid dismissal. All the while, counsel for Plaintiffs continued to field inquiries from impacted class members, and continued to conduct factual investigation and legal research to develop and evaluate their claims. This led to a Consolidated Class Action Complaint in the Farley matter, and the Second Amended Class Action Complaint in the Alliance matter.

Second, while the parties did not engage in formal written discovery or depositions, Defendants provided ample information for the Plaintiffs to determine that Defendants had limited funds available to satisfy any judgment at the end of a long and expensive discovery process. Defendants provided the applicable insurance policies and coverage decisions, the applicable pleadings and judgments in the state court actions, which are a matter of public record, and provided additional information about their assets and liabilities.[11] Additionally, the Patient Settlement Class served ECL with informal discovery requests tailored towards both the merits of the case and class certification

Third, with respect to the circumstances surrounding the negotiations, the Judicial Settlement Conference was supervised by Judge Auld, an experienced Magistrate Judge, ensuring that arms-length bargaining occurred. Following the Judicial Settlement Conference, the parties continued to negotiate at arms' length to reach a global resolution

---

[11] Defendants have also committed to provide any further evidence, including financial statements, necessary to prove the existence of limited fund in order to support approval of the Settlement. (Exhibit 1, § 9.1).

and finalize the Settlement.

Finally, as for the experience of counsel, counsel for the Physician Settlement Class and counsel for the Patient Settlement Class have submitted declarations in support of the preliminary approval of this settlement. (Exhibits 12, 13). As is evident from those declarations, and the prior submissions leading to the Court's appointment of Interim Co-Lead Counsel for the Patient Settlement Class, counsel have extensive years of experience, including significant experience in class action litigation. They have engaged in extensive factual investigation and legal analysis of the claims and defenses at issue. In their view, the proposed settlement is fair and reasonable based upon their consideration of: (1) the relevant facts and applicable law; (2) the risks and uncertainties inherent in any litigation; (3) the anticipated duration, burden, and expense of additional litigation; (4) the terms and benefits of the proposed settlement; and (5) Defendants' limited financial resources.

### C. Proposed Settlement is Adequate

Adequacy is determined by weighing the terms of settlement in light of the following factors: (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement. *In re Jiffy Lube*, 927 F.2d at 159; *see also Horton*, 855 F. Supp. at 828.

Here, given the applicable Rule 23(b)(1)(B) limited fund class certification, the predominate issue is the fourth factor, the solvency of the defendants and the likelihood of recovery on a litigated judgment. *Herrera*, 818 F. App'x at 177–78 (affirming determination that limited settlement fund was adequate when "Defendants' liabilities far exceeded their assets"). That issue is addressed above. Any recovery over and above the Settlement is unrealistic due to the MOU, state court orders, and available insurance coverage under "wasting" policies.

The remaining factors also support settlement. The relative strength of the Plaintiffs' case and their ability to prevail on the merits in litigation, like all contested matters, is subject to numerous risks. The Court might decline to certify a class for litigation purposes, or Plaintiffs might not be able to establish Defendants' liability. The Settlement, in contrast, ensures benefits available to each class member. The level of proof required to obtain this compensation is *de minimis*, and much lower than would be required if these claims were litigated to conclusion.

Next, when considering the anticipated duration, burden, and expense of additional litigation, much is left to be done. The parties would have to engage in class certification discovery, including written discovery, document productions and review of same, depositions, and expert discovery. These activities would take a long time and require the expense of significant resources, which would further erode what little is left under Defendants' available insurance.

41

Further, even with the limited fund recovery, the relief offered for the Patient Settlement Class is adequate considering the risks of continued litigation. This is not only a complex case, but it is in an especially risky field of litigation: data breach. *See, e.g., In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17-md-2807, 2019 WL 3773737, at *7 (N.D. Ohio Aug. 12, 2019) ("Data breach litigation is complex and risky. This unsettled area of law often presents novel questions for courts. And of course, juries are always unpredictable."). Although data breach law is continuously developing, courts around the country are still grappling with what legal principles apply to the claims. *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 315 (N.D. Cal. 2018) (noting that "many of the legal issues presented in [] data-breach case[s] are novel"). Because the "legal issues involved in [data breach litigation] are cutting-edge and unsettled … many resources would necessarily be spent litigating substantive law as well as other issues." *In re Target Corp. Customer Data Security Breach Litig.*, No. 14-2522 (PAM/JJK), 2015 WL 7253765, at *2 (D. Minn. Nov. 17, 2015). Through the Settlement, Plaintiffs and Settlement Class Members gain significant and immediate benefits without having to face further risk.

The Settlement will provide members of the Patient Settlement Class with timely benefits which, due to Defendants' limited funds, would exceed what they could recover were they to secure a favorable judgment at trial. The monetary benefits provided by the Settlement are in line with those of other settlements in data breach class actions that have been approved by other courts. *See, e.g., Bray, et. al. v. GameStop Corp.*, No. 1:17-cv-01365 (D. Del. Dec. 19, 2018) (approving claims made settlement that would reimburse

up to $235/claim including, *inter alia*, expenses for lost time, payment for each card on which fraudulent charges incurred, costs of obtaining credit report, costs of credit monitoring and identity theft protection, as well as up to $10,000/claim for extraordinary expenses); *T.A.N. v. PNI Digital Media, Inc.*, No. 2:16-cv 00132, Doc. 46 (S.D. Ga. Oct. 20, 2017) (approving settlement for reimbursement up to $250/claim for out-of-pocket expenses plus up to $10,000/claim for reimbursement of extraordinary expenses).

In sum, the above factors, particularly the Defendants' limited financial resources, weigh heavily in favor of a finding that the Settlement is adequate. The benefits of the Settlement exceed the cost of continued and protracted litigation, the Settlement avoids the potential risks and expenses of a trial, and the Settlement assures a fair distribution of the available funds. The terms of the Settlement are fair, and the compensation afforded under the Settlement Agreement correlates adequately with the damages and losses claimed by Plaintiffs.

### D. Notice

The parties have engaged Epiq Global to serve as Settlement Administrator. (Exhibit 14, Epiq Global CV). Under the Settlement, the Settlement Administrator is responsible for, among other things, providing notice to the class members. The parties therefore request that the Court appoint Epiq Global to serve as the Settlement Administrator with the authority to disseminate notice in accordance with the Settlement and to perform all other duties described in the Settlement, including the processing and resolution of claim forms and approval of claims.

43

Prior to the Court's resolution of this motion and any hearing on same, the parties will submit a proposed notice plan, including the proposed Long Form Notice, website information, and other notice-related information, all of which shall (1) satisfy Rule 23(e)(1)'s requirement that notice be "reasonable," (2) apprise class members of the pendency of this litigation and of their right to object to the proposed Settlement, and (3) meet all applicable requirements of due process and applicable law.

Notice is straightforward for the Physician Settlement Class because Defendants' records contain email addresses of class members, which will allow notification via email.

Likewise, Defendants' records contain email addresses for members of the Patient Settlement Class. However, because Defendants are business associates covered by the Health Insurance Portability and Accountability Act ("HIPAA"), they cannot disclose the identity or contact information for members of the Patient Settlement Class to the Settlement Administrator unless "required by law," which would include an order of the Court. 45 CFR § 164.502; 45 CFR § 164.103. As a result, the Patient Settlement Class and Defendants request that the Court issue an order compelling Defendants to produce the names and contact information of members of the Patient Settlement Class to the Settlement Administrator for the limited purpose of providing notice of the Settlement and verifying claims related to the Settlement.

Defendants are currently collecting the data needed by the Settlement Administrator to appropriately formulate a notice plan for the Patient Settlement Class. (Exhibit 12, ¶¶ 26-27). Without contact information for these class members, notice would need to be

44

effectuated through publication notice. (*Id.*) However, ECL has advised that it has email addresses for the majority of the Patient Settlement Class which would allow direct notice. (*Id.*) Prior to the hearing on this motion, the parties will submit a formal notice plan with estimated costs.

In addition, pursuant to 28 U.S.C. § 1715, Defendants' counsel will provide all required notices to government regulators, said notice to be given within ten days of the date of the filing of the instant motion.

## III. PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS SETTLEMENT CLASS COUNSEL

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, the court must consider the proposed class counsel's: (1) work in identifying or investigating potential claims; (2) experience in handling class actions or other complex litigation and the types of claims asserted in the case; (3) knowledge of the applicable law; and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). As discussed above, Plaintiffs' counsel have extensive experience prosecuting similar class actions and other complex litigation. Plaintiffs' counsel thoroughly investigated and analyzed the facts and circumstances relevant to the claims brought by Plaintiffs in this case. Plaintiffs' counsel have diligently and efficiently prosecuted the claims in this matter, dedicated substantial resources toward the endeavor, and have successfully and fairly negotiated the Settlement of this matter to the benefit of

45

Plaintiffs and the settlement classes. Therefore, Plaintiffs request that the Court appoint Jean Martin of Morgan & Morgan Complex Litigation Group, Gary M. Klinger of Milberg Coleman Bryson Phillips Grossman, PLLC, and Gary E. Mason of Mason LLP as Settlement Class Counsel for the Patient Settlement Class, and Russ Ferguson, Matthew Tilley, and Patrick Spaugh of Womble Bond Dickinson (US) LLP as Settlement Class Counsel for the Physician Settlement Class.

## CONCLUSION

For these reasons, the parties respectfully request that the Court grant their joint motion for preliminary approval of class action settlement and for preliminary certification of settlement class, and:

- preliminarily certify the Physician Settlement Class and Patient Settlement Class as Rule 23(b)(1)(B) classes;

- preliminarily approve the Class Action Settlement Agreement;

- approve the appointment of Settlement Class Counsel for the Patient Settlement Class and Physician Settlement Class, and named Plaintiffs as Representative Plaintiffs;

- approve the appointment of the Settlement Administrator as identified to carry out all of the functions set forth herein and in the Settlement;

- compel Defendants to produce the names and contact information of members of the Patient Settlement Class to the Settlement Administrator for the limited purpose of providing notice of the Settlement and verifying claims related to the Settlement; and,

- set a deadline for submission of a Notice Plan to be approved by the Court; and

46

- schedule a fairness hearing.

This the 28th day of July, 2023,

<div style="margin-left:40%">

*/s/ Matthew F. Tilley*
Russ Ferguson (N.C. Bar No. 39671)
russ.ferguson@wbd-us.com
Matthew F. Tilley (NC Bar No. 40125)
matthew.tilley@wbd-us.com
Patrick G. Spaugh (N.C. Bar No. 49532)
patrick.spaugh@wbd-us.com
WOMBLE BOND DICKINSON (US) LLP
One Wells Fargo Center, Suite 3500
301 S. College Street
Charlotte, North Carolina 28202-6037
Phone: 704-350-6361

*Counsel for Alliance Ophthalmology, PLLC;*
*Dallas Retina Center, PLLC; Texas Eye and*
*Cataract, PLLC; and Hofacre Optometric*
*Corporation, on behalf of themselves and all*
*others similarly situated corporation*

*/s/ Kristen Ward Broz*
Matthew Nis Leerberg (N.C. Bar No. 35406)
mleerberg@foxrothschild.com
Kristen Ward Broz
kbroz@foxrothschild.com
FOX ROTHSCHILD LLP
P.O. Box 27525
Raleigh, NC 27611
Phone: 919-755-8700

*Counsel for Defendants*

</div>

47

*/s/ Jean Sutton Martin*

Gary M. Klinger
gklinger@milberg.com
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866-252-0878

Jean Sutton Martin (N.C. Bar No. 25703)
jeanmartin@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Phone: 813-559-4908

Gary E. Mason
gmason@masonllp.com
MASON LLP
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Phone: 202-429-2290

*Interim Co-Lead Counsel for Kimberly Farley,*
*Chad Forrester, and Kimberly Sandvig, on*
*behalf of themselves and all others similarly*
*situated*

48